**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| NORTHERN HEALTH FACILITIES, d/b/a TREMONT HEALTH AND REHABILITATION CENTER, | : : : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : : | 3:13-CV-01117 (JUDGE MARIANI) |
| FAITH BATZ, Individually and as Administratrix of the Estate of John Batz, Deceased, | : : : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### I.   Procedural History

Presently before the Court is a Motion to Compel Arbitration in an underlying state action arising from the death of federal Defendant's husband. (*See generally* Pl.'s Mot. to Compel Arb., Doc. 2; *see also* Am. Compl., Doc. 11, Ex. J (underlying state complaint).)

According to Plaintiff's uncontradicted representations, on January 26, 2012, John Batz "became a resident of Tremont Health and Rehabilitation Center." (Brief in Supp. of Mot. to Compel Arb., Doc. 3, at 1.) Upon his admission to the Center, John's wife, Faith Batz, signed certain documents related to his admission, one of which was an Alternative Dispute Resolution ("ADR") Agreement. (*Id.* at 2.) The Agreement provided in relevant part that "[t]he Parties voluntarily agree that any disputes covered by this Agreement (herein after referred to as "Covered Disputes") that may arise between the Parties shall be

resolved exclusively by an ADR process that shall include mediation and, where mediation

does not successfully resolve the dispute, binding arbitration." (Def.'s Resp. to Mot. to

Compel Arb., Doc. 7, Ex. A., at 1 (Alternative Dispute Resolution Agreement).) Covered

Disputes are defined as "any and all disputes arising out of or in any way related to this

Agreement or to the Resident's stay at the Center that would constitute a legally cognizable

cause of action in a court of law sitting in the Commonwealth of Pennsylvania," including but

not limited to "tort; . . . negligence; gross negligence; malpractice; death or wrongful death

and any alleged departure from any applicable federal, state, or local medical, health care,

consumer or safety standards." (Id., Ex. A, at 2.) The Agreement further emphasized, in a

paragraph requiring separate acknowledgment:

> **THE PARTIES UNDERSTAND, ACKNOWLEDGE, AND AGREE THAT BY ENTERING INTO THIS AGREEMENT THEY ARE GIVING UP THEIR CONSTITUTIONAL RIGHT TO HAVE THEIR DISPUTE DECIDED BY A COURT OF LAW OR TO APPEAL ANY DECISION OR AWARD OF DAMAGES RESULTING FROM THE ADR PROCESS EXCEPT AS PROVIDED HEREIN. THIS AGREEMENT GOVERNS IMPORTANT LEGAL RIGHTS. YOUR SIGNATURE BELOW INDICATES YOUR UNDERSTANDING OF AND AGREEMENT TO THE TERMS SET OUT ABOVE. PLEASE READ IT COMPLETELY, THOROUGHLY AND CAREFULLY BEFORE SIGNING.**

(Id., Ex. A, at 4.) This paragraph was individually initialed by Faith Batz and by a

representative of the Tremont Center, (see id., Ex. A), and the full agreement was signed by

the same, (see id., Ex. A, at 5.)

    In mid-February, while at the Tremont Center, John Batz allegedly suffered a deep

tissue injury which deteriorated into "necrotizing fasciitis with Fourniers gangrene," requiring

2

transfer to a hospital and multiple operations. (Doc. 11, Ex. J, at ¶¶ 21-26.) "By March 5, 2012, [Batz] had developed a large open wound that extended from his sacrum to his perineum." (*Id.*, Ex. J, at ¶ 28.) At this point, Mr. Batz "was discharged from [the hospital] to home hospice where he died 8 days later on or about March 24, 2012." (*Id.*, Ex. J, at ¶ 29.) His wife then filed a state court action individually and as administratrix of his Estate.

The Tremont Center in turn filed this federal action to stay the state court proceedings and to compel Mrs. Batz to arbitrate. (*Id.* at 8.) Tremont argued that by bringing an action in state court, Mrs. Batz "ignored the valid and enforceable ADR Agreement she executed on behalf of her husband, which obligated her, as the Administratrix of her husband's estate, to resolve any disputes she had with the Center by using the ADR process in accordance with that ADR Agreement." (Doc. 3 at 3.)

On the basis of the memoranda that the parties have filed so far, there are two unresolved disputes concerning the Motion to Compel, to wit:

a. Whether ADR Agreement was properly executed when it was signed by Faith Batz, rather than John Batz, and

b. Whether the ADR Agreement is enforceable through a federal action to compel arbitration, either (i) according to its written terms or (ii) under the Pennsylvania Superior Court's recent decision in *Pisano v. Extendicare Homes, Inc.*, 77 A.3d 651 (Pa. Super. Ct. 2013).

## II.   Analysis

### a.   Validity of Faith Batz's Signature[1]

As an initial matter, it is indisputable that John Batz did not sign the ADR Agreement, even though he is named as a party to it. (*See* Doc. 7, Ex. A, at 1 ("This Alternative Dispute Resolution . . . Agreement . . . is entered into by Extendicare Health Services, Inc. on behalf of its parents, affiliates, and subsidiaries including Tremont Health & Rehab Center . . . , a nursing facility, and John Batz, a Resident at the Center[.]").) The signature page clearly bears the signature of Faith Batz, above the signature lines "Legal Representative for Healthcare Decisions" and "Legal Representative for Financial Decisions," respectively. (*Id.*, Ex. A, at 5.)

Under well-known agency principles, an agency relationship "arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01. "There are four grounds upon which a [factfinder] can conclude that an agency relationship exists and

---

[1] In a later filing, submitted five and a half months after Defendant first raised this issue and in an unrelated context (i.e., the applicability of *Pisano v. Extendicare Homes*, discussed in section II.b.ii, *infra*), Defendant appears to accept that Mrs. Batz acted as her husband's agent when she signed the Agreement. (Def.'s Resp. to Pl.'s Supp. Briefs, Doc. 29, at 1-2 ("Even through [*sic*] Defendant signed the ADR agreement, she certainly did not sign it in her own individual capacity or in her capacity as Administratrix of the Decedent.").) This concession, if accepted, would nullify Defendant's entire argument on the signature issue. Nonetheless, due to the casual manner in which the purported concession was made, and due to the fact that it was not raised until months after briefing ended on the original motion to compel, the Court cannot confidently divine whether Defendant really seeks to concede this point or not. In the interests of caution, the Court will therefore provide a ruling on the issue, even if it was arguably withdrawn.

4

that the principal is bound by a particular act of the agent and liable to third parties on the basis thereof." *Bolus v. United Penn Bank*, 525 A.2d 1215, 1221 (Pa. Super. Ct. 1987). That is, an agency relationship can be based on (1) express authority, (2) implied authority, (3) apparent authority, or (4) authority that the principal is estopped from denying. *Id.* Indeed, the signature page of the ADR Agreement that Faith Batz signed in the spaces providing for execution by a "Legal Representative" expressly states that, if the Agreement is signed by a Legal Representative, "the representative certifies that the Center may reasonably rely upon the validity and authority of the Representative's signature based upon actual, implied or apparent authority to execute this Agreement as granted by the Resident." (Doc. 7, Ex. A, at 5.)

"Whether an agency relationship exists is a question of fact" that will vary from case to case. *Bolus*, 525 A.2d at 1221. Thus, even though Defendant cites cases where a principal did not grant authority to a purported agent sufficient to create an agency relationship, (*see* Def.'s Resp. to Mot. to Compel Arb., Doc 7-1, at 2-4), such factual contingencies are not binding in the instant case.

On the contrary, in the instant case the Court has evidence of the following facts, from the sworn Affidavit of Nurse Jayne Kintzel, which Plaintiff provided in its Reply Brief to the Motion to Compel Arbitration. (*See generally* Affidavit of Jayne Kintzel, LPN, Doc. 13, Ex. A.) Nurse Kintzel testifies that, upon meeting John Batz before his admission to the Tremont Center, she "noticed that Mr. Batz was blind." (*Id.*, Ex. A, at ¶ 6.) Subsequently,

5

when she "attempted to present the [intake] documents, including the ADR Agreement, to Mr. Batz for his signature, he said that, since he cannot see, that his wife should sign for him." (*Id.*, Ex. A, at ¶ 8.) Mrs. Batz subsequently reviewed and signed the documents. (*See id.* at ¶¶ 9-11.) Moreover, because Mr. Batz was present throughout the entire time required for his wife to review and sign all of the intake documents, Nurse Kintzel believed that "Mr. Batz knew that his wife signed the paperwork related to his admission to Tremont for him and, to [Kintzel's] knowledge, he did nothing after she signed the documents on his behalf to indicate that she did not have his authority to do so." (*Id.*, Ex. A, at ¶ 15.)[2]

Because Kintzel's testimony was first raised in a reply brief, and because Defendant never sought leave to file a sur-reply, the Court ordered a conference call with counsel on January 22, 2014 to determine to what extent Kintzel's statements were in dispute. Counsel for the Defendant informed the Court that Defendant does not dispute the following facts: that John Batz was blind and had no other mental infirmities, (*see* Unofficial Tr., Jan. 22, 2014, at 3:5-6); that John told Kintzel that his wife should sign the Agreement, (*see id.* at 3:10-11); that Faith Batz had the opportunity to read and review the documents related to her husband's admission, and signed all such documents, (*see id.* at 3:14, 19-21); that John

---

[2] As Plaintiff notes, Nurse Kintzel's testimony does not present problems under the Dead Man's Act, 42 Pa. Cons. Stat. Ann. § 5930, because the Dead Man's Statute applies only to oral testimony, *see Larkin v. Metz*, 580 A.2d 1150, 1153 (Pa. Super. Ct. 1990), and, even then, not to agents or employees of a surviving party to a transaction, *see Visscher v. O'Brien*, 418 A.2d 454, 458 (Pa. Super. Ct. 1980). This latter category clearly includes Kintzel, who at the time of the transaction was an employee of surviving party Tremont.

was present throughout this entire process, (*see id.* at 4:5-8); and that John took no further action after his wife signed the documents, (*see id.* at 4:9-12).[3]

On the basis of the undisputed factual portions of Kintzel's testimony, the Court finds sufficient evidence to establish that Faith Batz had express authority to sign these documents on her husband's behalf. "Express authority exists where the principal deliberately and specifically grants authority to the agent as to certain matters." *Walton v. Johnson*, 66 A.3d 782, 786 (Pa. Super. Ct. 2013). John Batz's grant of authority could not be any more deliberate or specific than requesting his wife to sign documents for him, in the presence of third parties, and then waiting for her to fulfill his request. There is, moreover, no evidence that such statements were not made willfully, knowingly, or intelligently. Accordingly, Defendant's claim that Faith Batz's signature invalidates the Agreement is unavailing. She may not avoid arbitration on this basis.

### b. Enforceability of the ADR Agreement

#### i. Whether the Agreement Requires an Initial Submission to State Court

Next, Defendant argues that, under the terms of the ADR Agreement, the case must proceed to a Pennsylvania state court before proceeding to arbitration. (Def.'s Mem. of Law

---

[3] Counsel did, however, dispute Kintzel's legal conclusions that John did not lack mental capacity to make his own legal and medical decisions, (*see* Unofficial Tr. at 3:7-9); that Faith acted in accordance with her husband's instructions, (*see id.* at 3:16-18); that Faith signed the documents "on her husband's behalf," (*see id.* at 3:21-23); and the inference that "since he was present during this process, Mr. Batz knew that his wife signed the paperwork related to his admission to Tremont for him," (*see id.* at 4:5-6). He also disputed Kintzel's statement that "[f]ollowing Mr. Batz' instructions, I requested that Mrs. Batz review the paperwork related to her husband's admission." (*See id.* at 3:14.)

7

Contra Interstate Commerce Nexus, Doc. 22, at 2.) This is based on a paragraph in the

Agreement that states as follows:

> 5. <u>Governing Law</u>. Except as may be otherwise provided herein, this
> Agreement shall be governed by the terms of the Pennsylvania Uniform
> Arbitration Act which is set forth at 42 Pa. Cons. Stat. §§7301 et seq. If for
> any reason there is a finding that Pennsylvania law cannot support the
> enforcement of this Agreement, then the parties agree to resolve their
> disputes by arbitration (and not by recourse to a court of law) pursuant to the
> Federal Arbitration Act (9 U.S.C. Sections 1-16) and the Federal Arbitration
> Act shall apply to this Agreement and all arbitration proceedings arising out of
> this Agreement, including any action to compel, enforce, vacate, or confirm
> any proceeding and award or order of an arbitrator. The mediation and/or
> arbitration location shall occur in the Commonwealth of Pennsylvania, in the
> county in which the Center is located unless otherwise agreed by the Parties.

(Doc. 7, Ex. A, at 2.)

Defendant's argument is somewhat difficult to follow, but appears to essentially

allege that the above clause "does not even invoke the FAA" but relies only on

Pennsylvania law via its references to the Pennsylvania Uniform Arbitration Act (PUAA).

(Doc. 22 at 1.) Defendant then interprets the clause as requiring that a state court must first

make a determination as to whether Pennsylvania law supports the enforcement of the

arbitration agreement. (*Id.* at 2.) "Before the FAA can be even invoked by Plaintiff, there

must be such a finding according to the terms and conditions of the agreement itself." (*Id.*)

However, according to the Defendant, even if Pennsylvania law would allow arbitration, the

Agreement is still not necessarily subject to arbitration, because a court could still "enforce

the agreement" while—for some unexplained reason—ignoring the arbitration clause and

submitting the case to a jury trial instead. (*Id.*) This outcome purportedly arises from an

8

ambiguity in the phrase "enforcement of this agreement," although Defendant does not

explain just what this ambiguity is. (See id.)

Defendant's argument, however, runs directly contrary to the purpose of the Federal

Arbitration Act, as interpreted by clear and binding Supreme Court precedent. The FAA

provides, in pertinent part, that a

> written provision in . . . a contract evidencing a transaction involving
> commerce[4] to settle by arbitration a controversy thereafter arising out of such
> contract or transaction . . . shall be valid, irrevocable, and enforceable, save
> upon grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

The Supreme Court has "held that the FAA pre-empts state laws which 'require a

judicial forum for the resolution of claims which the contracting parties agreed to resolve by

arbitration.'" Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ., 489

U.S. 468, 478, 109 S. Ct. 1248, 1255, 103 L. Ed. 2d 488 (1989) (quoting Southland Corp. v.

Keating, 465 U.S. 1, 10, 104 S. Ct. 852, 858, 79 L. Ed. 2d 1 (1984)). "The preeminent

concern of Congress in passing the [FAA] was to enforce private agreements into which

parties had entered, and that concern requires that we rigorously enforce agreements to

arbitrate . . . ." Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 221, 105 S. Ct. 1238,

1242, 84 L. Ed. 2d 158 (1985).

---

[4] The parties agree that the commerce component of the Act is satisfied. (See Doc. 22 at 3 ("As
for the interstate commerce arguments being asserted by Plaintiff, Defendant cannot, in good faith argue
against them based upon review of existing case law.").)

9

Moreover, agreeing to abide by the PUAA's arbitration procedures should not be interpreted as contractual bypass of the FAA or as a requirement that a dispute subject to an arbitration agreement be submitted first to state court. As the Third Circuit held while upholding the enforceability of a very similar[5] arbitration agreement, "parties may contract to arbitrate pursuant to arbitration rules or procedures borrowed from state law, and the federal policy [under the FAA] is satisfied so long as their agreement is enforced." *Ario*, 618 F.3d at 288 (internal alterations omitted) (quoting *Roadway Package Sys., Inc. v. Kayser*, 257 F.3d 287, 292 (3d Cir. 2001)).

> Indeed, [preventing the enforcement of agreements to arbitrate under different rules than those set forth in the FAA itself] would be quite inimical to the FAA's primary purpose of ensuring that private agreements to arbitrate are enforced according to their terms. Arbitration under the Act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit. Just as they may limit by contract the issues which they will arbitrate, so too may they specify by contract the rules under which arbitration may be conducted. Where, as here, the parties have agreed to abide by state rules of arbitration, enforcing those rules according to the terms of the agreement is fully consistent with the goals of the FAA . . .
> .

*Volt*, 489 U.S. at 479 (internal citations omitted).

Under this clear precedent, the Court can find no support for Defendant's argument that this case should proceed in state court. Nor is there any ambiguity in the agreement that could justify nullifying the arbitration clauses. Read in the context of the full agreement,

---

[5] The relevant provision of the agreement before the Third Circuit stated: "Except as hereinabove provided, the arbitration shall be in accordance with the rules and procedures established by the Uniform Arbitration Act as enacted in Pennsylvania." *Ario v. Underwriting Members of Syndicate 53*, 618 F.3d 277, 284 (3d Cir. 2010).

which, as discussed above, is a clear waiver of trial rights and an agreement to arbitrate, the "Governing Law" clause simply establishes that the rules enumerated in the PUAA or, failing that, the FAA, will govern any arbitration proceeding. The Defendant's conclusory allegations of "ambiguity" cannot negate the clear meaning of the Agreement or undercut Congress's "principal purpose [in enacting the FAA] of ensuring that private arbitration agreements are enforced according to their terms." *Id.*

### ii. Applicability of *Pisano v. Extendicare Homes*

However, this does not end the inquiry. While Plaintiff's Motion remained pending before the Court, the Pennsylvania Superior Court decided the case of *Pisano v. Extendicare Homes, Inc.*, 77 A.3d 651 (Pa. Super. Ct. 2013). Defendants first brought the case to the Court's attention in a reply to a request for briefing on an unrelated issue, (*see* Doc. 22 at 3), and the issue was then extensively briefed by both parties, (*see* Docs. 25, 28, 29).

In *Pisano*, the Superior Court held that a wrongful death claim may not be sent to arbitration on the basis of an ADR agreement signed by the decedent or his agent, even if the agreement at issue called for wrongful death claims to be submitted to arbitration, and even if a survival claim arising out of the same occurrence must be sent to arbitration under the terms of the agreement, because wrongful death claims, unlike survival claims, are not "derivative of the rights of the decedent." *Pisano*, 77 A.3d at 663. The court held that, under Pennsylvania law, a wrongful death claim "shall exist only for the benefit of the

11

spouse, children or parents of the deceased." *Id.* at 656 (quoting 42 Pa. Cons. Stat. Ann. §

8301(b)). This is different from a survival action, where "[t]he recovery of damages stems

from the rights of action possessed by the decedent at the time of death." *Id.* at 658

(quoting *Moyer v. Rubright*, 651 A.2d 1139, 1141 (Pa. Super. Ct. 1994)). Thus, whereas the

decedent can contract away his own right to recover in court under a survival action and

thereby limit such an action to arbitration, he cannot so alienate the rights of third parties to

recover in their own wrongful death actions. *Id.* at 661 ("In the case *sub judice*, Appellee

does not have an agreement with Belair to arbitrate. Belair's agreement is between it and

Decedent alone. Regardless of Belair's intent, Pennsylvania's wrongful death statute . . .

does not characterize Appellee and other wrongful death claimants as third-party

beneficiaries. It is, therefore, clear under relevant contract law that the trial court herein

properly refused to compel arbitration. . . . [H]olding otherwise would operate against the

principles of Pennsylvania contract law and the FAA.").

Thus, according to the *Pisano* court, even though it is true that both Pennsylvania

and the FAA favor agreements to arbitrate, this "liberal federal policy favoring arbitration"

was "not intended to render arbitration agreements more enforceable than other contracts."

*Id.* at 660-61. Allowing the decedent to contract away the rights of third parties who are not

the beneficiaries of an arbitration agreement would indeed undo traditional contract

principles and make arbitration agreements much more powerful than other agreements,

solely by virtue of the fact that they concern arbitration.

### 1.  Faith Batz's Signature is Irrelevant under *Pisano*

Plaintiff seeks to avoid *Pisano* first by arguing that "it has no application in the instant

case because the ADR agreement was *not* signed by the decedent but by his wife." (Pl.'s

Supp. Brief in Resp. to Def.'s Mem. of Law Contra Interstate Commerce Nexus, Doc. 25, at

5-6.)  This argument fails for two reasons.

First, the *Pisano* court made no distinction as to who signed the contract, as long as

the person signing it was acting as an agent.  Its opinion indicates that the ADR agreement

at issue was signed by "Jamie Pisano, the decedent's daughter" on the decedent's behalf

(i.e., as his agent).  *Pisano*, 77 A.3d at 653.  The fact that the decedent did not physically

sign the document played no role in the court's analysis.

Second, even if the *Pisano* facts were otherwise, the clear message of the decision

is that a party can only alienate the rights it actually possesses.  As discussed above,

Plaintiff has already argued—and the Court agrees—that Faith Batz was acting as her

husband's agent when she signed the ADR Agreement.  All that she was doing was to

assist John Batz in the exercise of his own rights, not to exercise any of her own.  Because

she was acting on John's behalf—and not her own—when she signed the agreement, the

fact that she put her own signature on paper can have no legal significance.  Nor is it

significant that Mrs. Batz later filed the state action both individually and as administratrix of

her husband's estate, as Plaintiff insinuates.  (Doc. 25 at 6.)  Clearly, the individual claims

are severable from those of the estate, and under *Pisano* they must be so severed.

## 2. *Pisano* Represents the Law of Pennsylvania

The next issue to resolve is whether *Pisano* is properly binding on this Court as the law of Pennsylvania. "Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state." *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S. Ct. 817, 822, 82 L. Ed. 1188 (1938). The scope of state contract law is obviously the type of matter in which the federal court must apply the law of the state. However, the analysis is somewhat complicated by the fact that "when, as here, the highest state court has not yet authoritatively addressed the critical issue . . . . our disposition of such cases must be governed by a prediction of how the state's highest court would decide were it confronted with the problem." *McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 661 (3d Cir. 1980). In making such a prediction, decisions of lower state courts "should be accorded 'proper regard,' of course, but not conclusive effect." *Id.* at 662. Accordingly, this Court is not automatically bound by the *Pisano* opinion if there is reason to predict that the Pennsylvania Supreme Court would interpret the law differently.

In the case of *Grbac v. Reading Fair Co.*, 688 F.2d 215 (3d Cir. 1982), the Third Circuit came to the opposite conclusion as *Pisano* and held that "the wrongful death action is purely derivative," meaning that the Pennsylvania Wrongful Death Act does not create "a separate claim on behalf of the surviving spouse and children which is not affected by the decedent's execution of a pre-mortem release." *See id.* at 216-17. The Circuit concluded that a nineteenth-century Pennsylvania Supreme Court case, *Hill v. Pennsylvania R.R. Co.*,

14

35 A. 997 (Pa. 1896), "is still the controlling law of Pennsylvania" and prevents recovery for

wrongful death claims when a decedent had executed a pre-mortem release for his own

personal injuries and death. *Grbac*, 688 F.2d at 217. In *Hill*, the Pennsylvania Supreme

Court held that, in a wrongful death claim, "the right of action conferred is for the death of

the party injured" and that the decedent's representative brings the legal claim only as a

matter of obvious practical necessity, rather than because wrongful death is the

representative's own cause of action. *Hill*, 35 A. at 998.

However, as pointed out in *Pisano*, though *Hill* correctly interpreted the Pennsylvania

Wrongful Death Act at the time of it decision, the Act was subsequently amended in 1911 to

distinguish between wrongful death actions and survival actions. *Pisano*, 77 A.3d at 656.

Thus, in *Hill*, the Court represented the relevant statute as follows:

> Sec. 18. That no action hereafter brought to recover damages for injuries to
> the person by negligence or default, shall abate by reason of the death of the
> plaintiff; but the personal representatives of the deceased may be substituted
> as plaintiff, and prosecute the suit to final judgment and satisfaction.
> Sec. 19. That whenever death shall be occasioned by unlawful violence or
> negligence, and no suit for damages be brought by the party injured during
> his or her life, the widow of any such deceased, or, if there be no widow, the
> personal representatives, may maintain an action for, and recover damages
> for, the death thus occasioned.

*Hill*, 35 A. at 998. Conversely, the modern Wrongful Death Act reads as follows:

> (a) General rule.--An action may be brought, under procedures prescribed by
> general rules, to recover damages for the death of an individual caused by
> the wrongful act or neglect or unlawful violence or negligence of another if no
> recovery for the same damages claimed in the wrongful death action was
> obtained by the injured individual during his lifetime and any prior actions for

15

the same injuries are consolidated with the wrongful death claim so as to avoid a duplicate recovery.

(b) Beneficiaries.--Except as provided in subsection (d), the right of action created by this section shall exist only for the benefit of the spouse, children or parents of the deceased, whether or not citizens or residents of this Commonwealth or elsewhere. The damages recovered shall be distributed to the beneficiaries in the proportion they would take the personal estate of the decedent in the case of intestacy and without liability to creditors of the deceased person under the statutes of this Commonwealth.

42 Pa. Cons. Stat. Ann. § 8301(a)-(b).

The juxtaposition of the two statutes indicates a shift from vesting statutory rights in the decedent to vesting them in the decedent's statutorily enumerated beneficiaries. *See also Frey v. Pa. Elec. Co.*, 607 A.2d 796, 798 (Pa. Super. Ct. 1992) ("In contrast [to a survival action], wrongful death is not the deceased's cause of action. . . . Wrongful death damages are implemented to compensate the spouse, children, or parents of the deceased for the pecuniary loss they have sustained by the denial of future contributions decedent would have made in his or her lifetime."). The Pennsylvania Supreme Court has repeatedly emphasized the same, in the context of issues closely related to the one at hand. *See, e.g., Anthony v. Koppers Co., Inc.*, 436 A.2d 181, 185 (Pa. 1981) ("As distinguished from the wrongful death statutes, the survival statutes do not create a new cause of action; they simply permit a personal representative to enforce a cause of action which had already accrued to the deceased before his death."); *Pezzulli v. D'Ambrosia*, 26 A.2d 659, 661 (Pa. 1942) ("[Survival and wrongful death actions] are entirely dissimilar in nature. The one represents a cause of action unknown to the common law and is for the benefit of certain

16

enumerated relatives of the person killed by another's negligence . . . . The other is not a new cause of action at all, but merely continues in his personal representative the right of action which accrued to the deceased at common law because of the tort . . . ."); *see also Tulewicz v. Se. Pa. Transp. Auth.*, 606 A.2d 427, 431 (Pa. 1992) (holding, on the basis of *Pezzulli, supra,* that, because "the two actions are designed to compensate two different categories of claimants," bringing "the two causes of action by one named person, the administrator herein" does not subject "the respective parties to the \$250,000.00 aggregate damage limitation cap"); *Keystone Aerial Services, Inc. v. Pa. Prop. & Cas. Ins. Guar. Ass'n*, 829 A.2d 297, 301-02 (Pa. 2003) (agreeing with the interpretation that *Tulewicz, supra,* construed the damage limitation cap as a "'per-plaintiff' cap," and thereby reaffirming the independence of each claim).

In light of the foregoing, the Court finds the *Pisano* decision to be a more persuasive interpretation of Pennsylvania law than the *Grbac* decision. Though this Court is normally bound by all precedential decisions from the Third Circuit, this is not the case when it interprets the law of a sovereign state under *Erie.* In such situations, Third Circuit decisions that do not constitute the law of the instant case carry only persuasive value. *See Aceto v. Zurich Ins. Co.*, 440 F.2d 1320, 1321-22 (3d Cir. 1972) ("The matter in dispute is the correct interpretation of Pennsylvania law. While this court must often undertake such interpretation, final authority upon all such matters is vested in the highest court of the Commonwealth. *No one may properly rely upon what we have held as more than*

17

*persuasive on a question of Pennsylvania law* so long as the Pennsylvania Supreme Court has not ruled upon that legal question.") (emphasis added); *Hittle v. Scripto-Tokai Corp.*, 166 F. Supp. 2d 159, 162 (M.D. Pa. 2001) (summarizing relevant case law and then "assum[ing] without deciding that we are not strictly bound by [Third Circuit predictions of state law] and that we are free to make a contrary prediction"). Here, because the *Hill* case on which *Grbac* relied has been plainly superseded by later amendments to the wrongful death statute and because a review of Pennsylvania Supreme Court case law discloses that, over the past half century, it has consistently treated wrongful death claims as independent claims derived from the rights of a different plaintiff than the decedent, the Court predicts that the Pennsylvania Supreme Court would not adopt *Grbac* as state law. Rather, the Court predicts that the Pennsylvania Supreme Court would adopt *Pisano* as Pennsylvania's state law, when given the chance.

Finally, Plaintiff objects that *Pisano* cannot accurately state the law of Pennsylvania because it represents a radical departure from "100 years of jurisprudence" that would have the effect of invalidating a host of arbitration, settlement, and liability release agreements as they relate to wrongful death claims. (*See* Doc. 25 at 11-12.)

This argument must fail also, as it overlooks the fact that *Pisano* is ultimately a case about contract law, not arbitration. It is hard to imagine a principle better established through hundreds of years of common law than the principle that a party may only alienate through contract his rights to those things within his lawful control. Just as, absent an

18

agency relationship, a person may not sign a contract to sell his neighbor's house, so he may not sign a contract to waive his neighbor's trial rights. *See also E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294, 122 S. Ct. 754, 764, 151 L. Ed. 2d 755 (2002) ("The FAA directs courts to place arbitration agreements on equal footing with other contracts, but it does not require parties to arbitrate when they have not agreed to do so. . . . It goes without saying that a contract cannot bind a nonparty. Accordingly, the proarbitration goals of the FAA do not require the agency to [arbitrate] if it has not agreed to do so.").[6] Therefore, even if it is true that many existing Pennsylvania agreements submit wrongful death claims to arbitration, such agreements have always been in conflict with established contract law. *Pisano* may, arguably, be belated in explicitly making this point. But even if it is, belatedness cannot be conflated with radicalism.

### iii.  The FAA Requires Bifurcation

The FAA "requires piecemeal resolution when necessary to give effect to an arbitration agreement." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20, 103 S. Ct. 927, 939, 74 L. Ed. 2d 765 (1983). Accordingly, the United States Supreme Court has held that, when a defendant has two substantive disputes with separate plaintiffs arising from the same incident, and only one of those plaintiffs is subject to an arbitration agreement, then, as a matter of law under the FAA, the two claims must be heard in separate forums. *Id.* at 19-20.

---

[6] On this basis, Plaintiff's argument that *Pisano* conflicts with the FAA fails as well.

> Under the Arbitration Act, an arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement.   If the dispute between Mercury and the Hospital is arbitrable under the Act, then the Hospital's two disputes will be resolved separately—one in arbitration, and the other (if at all) in state-court litigation.

*Id.* at 20.  Such piecemeal litigation is required "irrespective of any concomitant decline in judicial efficiency." *Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.*, 571 F.3d 299, 309 (3d Cir. 2009).

Defendant notes these precedents but argues that the Court should decline to compel arbitration anyway, citing the inefficiency rationale that both the Supreme Court and Third Circuit have explicitly rejected. (*See* Doc. 29 at 2.) As the Supreme Court and Third Circuit precedents make clear, the policy of the FAA is not efficiency *per se*, but rather the promotion of arbitration, from which an incidental benefit is often—but not necessarily always—efficiency. *See, e.g., Volt*, 489 U.S. at 478 ("The FAA was designed to overrule the judiciary's long-standing refusal to enforce agreements to arbitrate and to place such agreements upon the same footing as other contracts.") (internal quotations and citations omitted).

Therefore, it is necessary to divide the Complaint for resolution.  The Wrongful Death claims (Counts I and III) cannot be arbitrated under Pennsylvania law as stated in *Pisano v. Extendicare Homes*.  On the other hand, as Defendant has provided no colorable reason why the Survival Action claims (Counts II and IV) cannot be arbitrated, the Court shall compel arbitration as to these latter claims.

## III.   Conclusion

Based on the foregoing considerations, Plaintiff's Motion to Compel Arbitration (Doc. 2) is **GRANTED** as to the Survival Action claims only.  A separate Order follows.

Robert D. Mariani
United States District Judge